## UNITED STATES v. CONSTRUCTION & GENERAL LABORERS LOCAL UNION NO. 264 et al.

### No. 18039.

United States District Court
W. D. Missouri, W. D.

Dec. 28, 1951.

Sam M. Wear, U. S. Atty., Fred L. Howard, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

Clif Langsdale, Kansas City, Mo., for defendants.

DUNCAN, District Judge.

The defendant, Construction and General Laborers Local Union No. 264, is a labor organization within the meaning of § 610, Title 18 U.S.C.A., and the defendants, Theodore Leonard Irving and Roy Edward Livingston are the President and Secretary of said Union.

On June 8, 1951, an indictment was returned against these defendants, charging them in twelve counts, with violating said § 610, 18 U.S.C.A. § 610, in that they did wilfully, knowingly and unlawfully expend the funds of the said labor organization for a contribution or expenditure in connection with a general election held November 2, 1948 particularly in the Fourth Congressional District of Missouri, at which election the names of candidates for election to the United States House of Representatives, including that of the defendant Theodore Leonard Irving, were presented.

It is charged that the contribution or expenditure was made in connection with the campaign of Theodore Leonard Irving for election as representative in Congress. Each count charged a different contribution by way of expenditure in connection with the campaign of the said Theodore Leonard Irving.

By agreement of parties, a jury was waived and the case came on for trial before the court on November 19–20–21, 1951. At the close of the Government's evidence, the defendants offered motions for directed verdict, which were sustained by the court as to Counts I, II, III, IV, VII, XI and XII, and taken under consideration as to counts V, VI, VIII, IX and X.

Since the defendants offered no testimony, the court, sitting as a jury, must decide the issues upon the evidence produced by the Government. It is the contention of the defendants that the evidence is not sufficient to sustain a verdict of guilty; and that the Act is unconstitutional in that it deprives them of rights reserved to the people by the First, Fifth, Sixth, Ninth and Tenth Amendments to the Constitution of the United States. The Act under which the indictment was brought, § 610 supra provides:

"§ 610. Contributions or expenditures by national banks, corporations or labor organizations

"It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be , in violation of this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"For the purposes of this section 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. June 25, 1948, c. 645, 62 Stat. 723, amended May 24, 1949, c. 139, § 10, 63 Stat. 90."

The Act upon which the Government bases its indictment, § 610, Title 18 U.S.C.A., is the old "Corrupt Practices Act" as amended by Section 304 of the Labor-Management Relations Act of 1947.

There is no evidence and no contention on the part of the Government that the labor organization made any contribution as described in § 591, 18 U.S.C.A. § 591, to said Theodore Leonard Irving or to his campaign. Irving had been nominated for representative in Congress at the primary election held on August 7, 1948. He was also president and business agent of the defendant Union at this time.

While the allegation of the indictment is that a *'contribution'* was made through the "expenditure of funds," the direct allegation of a contribution is not made in the indictment or sustained by the evidence. The statute defines "contribution" and "expenditure" as:

"The term 'contribution' includes a gift, subscription, loan, advance, or deposit, of money, or anything of value, and includes a contract, promise, or agreement to make a contribution, whether or not legally enforceable;

"The term 'expenditure' includes a payment, distribution, loan, advance, deposit, or gift, of money, or anything of value, and includes a contract, promise, or agreement to make an expenditure, whether or not legally enforceable; * * *." 18 U.S.C.A. § 591.

Of the five remaining counts which are now before the court for consideration, Count V charges: "That on or about the 22nd day of September, 1948, * * * Construction and General Laborers Local Union No. 264, * * * did wilfully, knowingly and unlawfully expend the funds of said labor organization as a contribution or expenditure in connection with the General Election held November 2, 1948 * * said contribution or expenditure being made in connection with the campaign of Theodore Leonard Irving for election as Representative in Congress * * * and being in the form of a union check in the amount of $11.25 payable to the Sinclair Service Station, 1441 Paseo, which service station was operated by Phil and Tom Arnone, in payment for merchandise furnished in connection with said campaign on behalf of Theodore Leonard Irving; * * *."

Count VI charges: "That on or about the 13th day of October, 1948, * * * Construction and General Laborers Local Union No. 264, * * * did wilfully, knowingly and unlawfully expend the funds of said labor organization as a contribution or expenditure in connection with the General Election held November 2, 1948 * * * said contribution or expenditure being made in connection with the campaign of Theodore Leonard Irving for election as Representative in Congress * * * in the form of a union check in the amount of $60.20 payable to Charles Clayton as compensation for personal services rendered in connection with said campaign on behalf of Theodore Leonard Irving; * * *."

Count VIII charges: "That on or about the 19th day of October, 1948, in Kansas City, Jackson County, Missouri, * * * the above named defendant, Construction and General Laborers Local Union No. 264 * * * did wilfully, knowingly and unlawfully expend the funds of said labor organization as a contribution or expenditure * * * in connection with the campaign of Theodore Leonard Irving for election as Representative in Congress * * * in the form of a union check in the amount of $59.00 payable to August Carple as compensation for personal services rendered in connection with said campaign on behalf of Theodore Leonard Irving; * * *."

Count IX charges: "That on or about the 5th day of November, 1948, in Kansas

City, Jackson County, Missouri, * * * Construction and General Laborers Local union No. 264, * * * did wilfully, knowingly and unlawfully expend the funds of said labor organization as a contribution or expenditure * * * in connection with the campaign of Theodore Leonard Irving for election as Representative in Congress from the Fourth Congressional District of Missouri, and being in the form of a union check in the amount of $200.00 payable to Theodore Baldwin as compensation for personal services rendered in connection with said campaign on behalf of Theodore Leonard Irving; * * *."

Count X charges: "That on or about the 11th day of November, 1948, * * * Construction and General Laborers Local Union No. 264, * * * did wilfully, knowingly and unlawfully expend the funds of said labor organization as a contribution or expenditure in connection with the General Election held November 2, 1948, * * * said contribution or expenditure being made in connection with the campaign of Theodore Leonard Irving as Representative in Congress * * * and being in the form of a union check in the amount of $20.00 payable to Bill Adams Garage for repairs and mechanical work on vehicle used in the said campaign of Theodore Leonard Irving; * * *."

In this case, the court sitting as a jury, must find and believe beyond a reasonable doubt, such facts as may be necessary to return a verdict of guilty against the defendants, under any of the counts. The Union admittedly owned a number of cars (the evidence shows 5). One of the cars apparently was used by an assistant business agent of the Union named Virgil A. Levitte who had been on the payroll of the Union since early May 1948, and remained on the payroll until February, 1949. After Irving opened his campaign, Levitte probably devoted the major portion of his time to the management of his political headquarters. The evidence shows that during that period he also performed his duties, at least a portion of them, as assistant business agent for the Union.

It was also shown that the Union had a charge account with the Arnones. The witness Phillip Arnone admits that on October 4 the sum of $20.50 was paid by the "Congress Club" Irving's political club.

Another car owned by the Union was operated by a man named Stanley Cole, who had been selected as campaign manager and publicity director for Irving. It was alleged that he purchased gasoline at the Arnone station, which gasoline was placed in a union car and used on behalf of Irving's campaign. He testified that Irving had supplied him with money to pay for gasoline, and that he had paid for some, but had charged other gasoline to the Union account. Cole had fallen out with Irving, and after the election admitted having threats against him subsequent to that time.

The evidence with respect to Count V is so utterly unconvincing and indefinite as to be wholly insufficient upon which to base a verdict of guilty.

Count X charges the expenditure of $20 for work on the "Freedom Train." The "Freedom Train" was a large trailer which was attached to and pulled by an automobile; the automobile had been converted so as to resemble a railroad locomotive, and the "Freedom Train" had been designed as a replica of the original Freedom Train which was shown throughout the United States some time prior to the 1948 election. On the side it bore the inscription "Freedom Caravan, Irving for Congress Club." It was conveyed from place to place in Irving's district and probably occasionally outside such district, and persons were invited to enter the trailer and view the exhibits, such as a replica of the Declaration of Independence, and other historical documents. At such places campaign literature was handed out by those in charge of the train, to persons who came to inspect it. It was in connection with this train that the Government charges the Union defendant with making an expenditure in the nature of a repair bill. The witness, William Adams, who ran the garage where the work was done, testified:

"A. I did some work on a Buick car.

"Q. Who ran that Buick car? A. Different ones run it.

"Q. Who? A. Mr. Stanley Cole brought it there.

"Q. He brought it there and had the work done, is that right? A. Yes, sir.

*   *   *   *   *   *

"Q. Now, I will ask you to state whether or not you did any work on the Freedom train? A. Yes, sir, I did a little work on the Freedom train.

"Q. There were two Freedom trains, were there not? A. Yes, sir.

"Q. One owned by Silas Evans. Did you do any work on that? A. Yes, sir.

"Q. The one purchased in St. Louis for Mr. Irving, did you do work on that? A. Yes, sir; they did work on that."

The check was dated November 11, 1948 —subsequent to the election.

"A. You see, as long as that has been, with me not having no record, the best statement I can give you is work that they paid me for on this Freedom Train and the Buick, see, but to go back and tell you *   *

"Q. (Interrupting) It was either the Buick run by Mr. Cole, or the Freedom Train, is that correct? A. That is the way that worked."

On cross examination in response to a question by defendants' counsel, the witness testified:

"Q. Do you know when the work was done? A. No, sir, I don't now, I don't know the date, but it was during the campaign, along the latter part of the campaign.

*   *   *   *   *   *

"Q. Is there any record of that in the place where you worked? A. No. I ain't working there now, I am driving a cab. I went broke and went down to the Midland Cab, and I went to work.

"Q. You don't know when the work was done, then? A. Not exactly.

"Q. You don't know what machine it was on? A. No, sir, I can't recall."

A review of all of the testimony reveals the uncertainty of just what the expenditure was made for, whether it was for the Union, or whether it was for the benefit of Irving. There was no definite evidence as to whether or not the check given was for work on the Buick which was owned by the Union, or whether it was for repairs on the Freedom Train that was being operated in behalf of Irving. The testimony also revealed that a second Freedom Train was owned by a third party, and there was no other evidence concerning this person or his train.

If the charges were for the Buick automobile which admittedly was owned by the Union, and which was being operated both on Union business and Irving's campaign, it would be rather difficult for the court to determine from this evidence whether the repairs were for the benefit of Irving, or for the benefit of the Union, which owned the automobile.

Like Count V, the evidence is so unsatisfactory as to make it impossible for the court to say beyond a reasonable doubt that an expenditure was made by the Union on behalf of Irving. Each of the counts involves an exceptionally small amount, and while the maxim of *de minimis non curat lex* [1] does not apply in criminal cases, it is hard to conceive that the Congress had in mind when it enacted this particular law, that an uncertain, insignificant amount such as is involved here should be considered as an expenditure and used as a basis for a criminal prosecution. However, it isn't necessary for the court to pass on that question with respect to Counts V and X, because it is the opinion of the court that the evidence is insufficient to justify a conviction.

The next three counts VI, VIII and IX present practically the same questions of fact, and the same legal problems. Count VI charges an expenditure of $60.20 to Charles Clayton as compensation for personal services rendered in connection with

1. "The law does not care for, or take notice of, very small or trifling matters. The law does not concern itself about trifles. Cro.Eliz. 353. Thus, error in calculation of a fractional part of a penny will not be regarded. Hob. 88. So, the law will not, in general, notice the fraction of a day. Broom, Max; 142." Black's Law Dictionary.

874

the campaign. There was written on the check when it was introduced in evidence, the words "cleaning walls and windows." On direct examination by the District Attorney, the witness testified:

"Q. Where did you work in the campaign here of 1948? A. Out of Local Union 264.

\* \* \* \* \* \*

"Q. What did you do out there? A. Why, they sent me out on jobs and things like that.

"Q. What kind of jobs? A. Construction jobs.

"Q. What else did you do? A. I worked around the hall there some.

"Q. Did you work in the campaign? A. I went out on the Freedom Train once or twice.

"Q. What did you do on the Freedom Train? A. Passed out the matches and little pamphlets.

"Q. What else did you do in the campaign? A. Hung some photographs up on porches and helped get people registered to vote.

"Q. Did you distribute any cards? A. Yes, sir.

"Q. Anything else? A. No. not any more.

\* \* \* \* \* \*

"A. Put posters, or put advertisements on the back of their cars. (Referring to Blue Line Cab Company.)

"Q. What kind of advertisement? A. 'Leonard Irving for Congress.'

"Q. What else did you do during the campaign, if anything? A. I don't know. That it all I done, was just work around there, worked on the Freedom Train, and what I have told you I done."

The witness also testified that he worked for the defendant Irving personally at his home, cutting his grass and around the yard; that he made two trips with the Freedom Train, one to Ivanhoe Temple and one to Blue Springs; that he had worked that week for the campaign of Irving for Congress; that the check for $60 was for work in the campaign.

Several checks were introduced in evidence which had been made out to the witness and signed by Irving. The witness further testified that the only work he had done for the Union was to put in a window. The witness further testified that he called for Irving and told him he had to have some money, that he went out to a designated point and was given a personal check, i. e., an Irving check; that he couldn't get it cashed, and "I took it back to the union hall to him and I told Roy to write that check out." ("Roy" meaning the defendant Livingston.)

The next, Count VIII, charges that the sum of $59 was paid to August Carple as compensation for personal services rendered in connection with the Irving campaign. With respect to this charge, the evidence reveals that the witness Carple, together with three other men, went to St. Louis and returned with the "Freedom Train" that was driven by him. He testified that he received no compensation for this service; that he worked in the election in connection with taking people to the polls for registration, and taking them to the polls on election day to vote; that he worked for the entire Democratic ticket; that he asked for pay but did not receive it at the time, but that later he received the check from the Union. There is no other testimony concerning his activities, for which he received any compensation.

In Count IX, it is charged that Theodore Baldwin was paid compensation for personal services in the sum of $200 in connection with Irving's campaign. This amount was paid to him on November 5, 1948. Baldwin was a regular employee of defendant Union and was a janitor at its Union hall. He had worked for it for 11 or 12 years, received the sum of $65 a week as wages. He testified that for a considerable period of time—in fact during the period of the campaign of Leonard Irving for Congress, he worked in connection with the election; he drove the Freedom Train; he passed out campaign literature and whatever was necessary in connection with its operation.

On cross examination he stated that he too had assisted in taking people to the polls for registration.

The only difference between this count and the others, is in degree. The evidence seems to indicate that Baldwin received an amount in excess of his regular pay as a janitor, for his work in the campaign.

The situation here is somewhat comparable to that in Count I, in which Virgil Levitte was involved. He was the assistant business agent and devoted a large portion of his time to the campaign. At the close of all the testimony, the court sustained a motion of acquittal as to Count I.

The registration of voters throughout almost every city and in many rural communities in the United States is required before they can cast a vote. This is one of the greatest problems that political parties, civic organizations and other groups interested in good government have to face in getting citizens to vote. Many of the states throughout the nation have provided for permanent registration, which continues so long as one remains at a fixed address and casts a vote. However, people move from one place to another, or neglect to vote at determined intervals, and thus lose this important right and must re-register. Among political parties and others interested in the affairs of good government, a constant and continuous effort is made to bring about the registration of these persons. As elections approach, the press of the country carry news items about such registration. It is not uncommon to see on the front page of a newspaper a reminder to persons who have not registered. There is not a school election, or a nonpartisan municipal election, or a bond election where the problem of registration is not a serious one.

■ Labor organizations have a right to engage in political activities just the same as any other group, and certainly the Congress has the right to at least control the expenditures and contributions of such groups, just as it does those of political parties and corporations. But in exercising this prerogative, the Congress hasn't the constitutional power to deprive them of the right to free speech, the right to express themselves in the choice of candidates and political ideals, and the right to engage in political activities as guaranteed them under the Bill of Rights. U.S.Const. Amendments 1 through 10.

The framers of the Act were familiar with all of these limitations, and surely it could not have been the intention of the Congress to deprive any group, labor organization or corporation from making expenditures, if necessary, in connection with the registration of voters, for such registration is beneficial to all candidates for office, local, state or federal, and to all political parties.

In the General Election in 1948 there appeared upon the ticket the candidates for President and Vice-President, Senators and Representatives in Congress, on the respective tickets, and also a full slate of state and local candidates. Whoever registered had a right to vote for those candidates of his choice, both on a local and national level. It could hardly be said that a labor organization in its attempt to bring about the registration of voters was interested solely in one candidate, when so many were to be chosen. If it is a violation of law for one upon the payroll of a labor organization to haul voters to the place of registration, or to haul voters to the booths on election day, or to engage in politics generally in connection with those on the proscribed list of candidates, then it would equally be a violation of the law for the employees of a corporation mentioned in the statute, to permit its employees, while on its payroll, to engage in political activities, or knowingly to pay such employees for time spent in connection with the registration and work done in connection with any candidacy for Federal office.

■ It seems difficult for me to believe that the Congress intended that its definition of "expenditure" should be construed by the court so narrowly as to apply in a case of this type. Here we have three employees, two of whom were regularly on the payroll of the Union, one for a long period of time, devoting a considerable portion of their time to political activities, some of which activities, such as the regis-

tration of voters and taking voters to the polls, were for the general benefit of those who were candidates, and some devoted exclusively to the political interests of one candidate for Congress, Theodore Leonard Irving.

If that is to be the construction placed upon this statute, then any political activity of any person on the payroll of a labor organization, from its president to its janitor, would render that Union and its principal officers liable, if such persons devoted any appreciable time in support of, or in opposition to any candidate for President, Vice President, Senator or Representative in Congress. If Philip Murray or William Green, for example, or any other president of a labor organization should draw a salary while making a speech in support of or in opposition to any candidate for Federal office, or if any of the expenses during such time were paid by a labor organization, such an activity would raise a serious question as to whether or not the labor organization and its officers might not be prosecuted under this Act. The same would be true of any corporation which permitted one of its employees while on its payroll to spend a few hours hauling voters to a place of registering, to vote, or to engage in any other type of political activity.

▆ If a strict construction is to be given to the statute, then it is not the degree of the activity, but the type of activity which would determine whether or not an expenditure had been made.

The debates in the Congress at the time the Labor-Management Relations Act was under discussion cover a very wide field, and it is impossible to reconcile just exactly what the Congress intended by its definition of "expenditure." Reiterating, it is difficult for me to believe that the Congress, with its vast knowledge of the practical application of its acts, intended such a restriction as is sought to be placed upon labor unions as here.

If the Court were to determine that the Congress did intend such meaning of the word, then it would be necessary to pass upon the constitutionality of the statute, but as I have heretofore held with respect to Counts V and X, the evidence is entirely insufficient to sustain the conviction, and in regard to the other counts, I believe that the Congress did not intend its definition of "contributions" to apply under the circumstances as shown by the evidence, and thus it is not necessary to pass upon the constitutionality of the statute. If that was the intent of the Congress, it should have been more clearly spelled out.

The question was before the United States Supreme Court in U. S. v. C. I. O., 335 U.S. 106, 68 S.Ct. 1349, 1351, 92 L.Ed. 1849. In that case the C. I. O. had deliberately published certain articles in "The C. I. O. News" in the District of Columbia. In those articles it urged the election of a certain representative for Congress in the State of Maryland. Philip Murray and the C. I. O. were indicted in the United States District Court for the District of Columbia. The defendants attacked the constitutionality of the Act, and the District Court sustained a motion to dismisss. In the order of the District Court, as quoted in the opinion of the Supreme Court, it was stated: " '* * * that that portion of Section 313 of the Corrupt Practices Act, as amended by Section 304 of the Labor-Management Relations Act, 1947, which prohibits expenditures by any labor organization in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, is unconstitutional.' "

On appeal to the United States Supreme Court, 335 U.S. 106, 68 S.Ct. 1349, 1374, 92 L.Ed. 1849, the court declined to pass upon the constitutionality of the section, disclaiming its duty to do so under the Criminal Appeals Act, but the court did hold that the facts stated in the indictment did not allege a crime, then proceeded in a long opinion to hold that Congress did not intend that the payment by a labor organization of the expenses of such a publication was intended or covered by the Act. In a separate opinion by four members of the

Court, in which they concurred in the result, but not in the reasoning, they expressed the strong view that the section was violative of the First Amendment, and unconstitutional. The last paragraph of this opinion states: "A statute which, in the claimed interest of free and honest elections, curtails the very freedoms that make possible exercise of the franchise by an informed and thinking electorate, and does this by indiscriminate blanketing of every expenditure made in connection with an election, serving as a prior restraint upon expression not in fact forbidden as well as upon what is, cannot be squared with the First Amendment."

Conforming to the view expressed by the Supreme Court in the C. I. O. case, that the acts charged against these defendants in Counts VI, VIII and IX are not violative of any provision of the Act, the motion of defendants for a verdict of acquittal with respect to each of the counts will be and is hereby sustained, and the defendants and each of them discharged.