**UNITED STATES of America, Plaintiff,**

v.

**ANCHORAGE CENTRAL LABOR COUNCIL, Anchorage, Alaska (AFL-CIO), Defendant.**

Cr. No. 4305.

United States District Court
D. Alaska,
at Anchorage.
April 22, 1961.

George M. Yeager, U. S. Atty., Fairbanks, Alaska, and James R. Clouse, Jr., Asst. U. S. Atty., Anchorage, Alaska, for plaintiff.

John L. Rader and Clifford J. Groh (of Hartlieb, Groh & Rader), Anchorage, Alaska, for defendant.

HODGE, District Judge.

The defendant in this case was indicted for violation of the statute making it unlawful for any corporation or any labor organization to make a contribution or expenditure in connection with any election at which a Senator or Representative in Congress are to be voted upon, being Section 610, Title 18 U.S.C.A. (Act of June 25, 1948, 62 Stat. 723, as amended). The indictment charged that the defendant labor organization, during the months of October and November, 1958, made an "expenditure" from the general fund of the organization in connection with the general election held in the State of Alaska on November 25, 1958, in which two United States Senators and one United States Representative in Congress were to be elected, such expenditure consisting of the sum of $244, paid from its general treasury fund to Northern Television, Inc., for the purpose of paying for the expense of four fifteen-minute television broadcasts sponsored by the defendant over television Station KTVA at Anchorage, which broadcasts included expressions of political advocacy

and were intended to influence the general electorate, including electors who were not members of any labor union or of the defendant organization, and to affect the results of said election.

The defendant is an association of some twenty-six local labor unions and is governed by delegates elected or appointed by the member unions. It assesses no dues against the individual union members, but collects a "per capita tax" from the unions, the amount of which is largely determined by the unions themselves. It also collected from the member unions contributions to a "TV fund" to conduct television programs under the title of "Building and Serving Anchorage," which had been regularly broadcast each week since the fall of 1955.

Upon the trial of the case before a jury and at the conclusion of the Government's case, the Court sustained a motion of the defendant for judgment of acquittal.

By reason of the importance of this matter, especially in the Ninth Circuit, and by stipulation of counsel, the oral decision of the Court, as revised for clarification or correction, is reduced to writing for publication:

I am persuaded that there is really no essential dispute of fact in this case. The facts are admitted by the defendant, which is a rather unusual situation in a criminal case except under pleas of nolo contendere.

Counsel for the Government has suggested an issue of fact as to whether or not the broadcasts were electioneering, and that may be so, but, yet, I do not believe that that issue is controlling here.

I find that it is the duty of the Court to determine as a matter of law whether the evidence produced on behalf of the Government with respect to the admitted expenditure of funds by the Anchorage Central Labor Council in payment of the broadcasts complained of constitutes a violation of the statute, being Section 610 of Title 18. This is not an easy problem. There are not many decisions of the federal courts upon the problem. Of those we do find all but two are decisions not upon the weight and sufficiency of the evidence but rather upon the sufficiency of the indictment. It is necessary to determine this question of law on the interpretation placed by the courts upon this statute, and I should like to first review them very briefly.

First of all there is the case of United States v. C. I. O., 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849, decided by the Supreme Court in 1948. In this decision, in which the history of the legislation is reviewed extensively, it is held that the statute does not forbid labor unions from taking part in pending elections by publishing and circulating newspapers in the regular course of conduct among their membership, although the costs of publication are paid from the unions' general funds, regardless of their source. This apparently was true despite the fact that the indictment charged that the newspaper published by the CIO not only went to the members but that some one thousand copies were distributed to the public at large. The Supreme Court did not seem to be particularly impressed with that fact. It seemed to be the thought in the majority opinion and concurring opinion that the test was largely whether or not this publication was in the regular course of the union's activities.

In the case of United States v. International Union of United Automobile Workers, decided by the District Court for the Eastern District of Michigan in 1956, 138 F.Supp. 53, it is expressly held, in a situation almost parallel to this case at bar, that expenditures made by a union from its general fund to defray the cost of a television broadcast, sponsored by the union from a commercial television station, which urged and endorsed the selection of certain persons as candidates for congressional office, which included expressions of political advocacy intended by the union to influence the electorate, were not "expenditures" prohibited by this act even though the funds

came from union dues and were not obtained by voluntary subscription of union members.

This decision reviews the CIO case and the decision of the Second Circuit in the case of United States v. Painters' Local Union, 2 Cir., 172 F.2d 854, in which it is held that the contribution or expenditure by a union for placing and paying for a political ad in a daily newspaper of general circulation, and a political broadcast over a commercial radio station, out of the general funds of the union, was not an expenditure prohibited by the act. A careful reading of the Painters' Union case, however, does indicate the theory of the court in that case was partly at least de minimus. It was a small painters' organization and a rather small cost. But this decision of the Second Circuit does distinguish between a normal activity of the labor organization and a contribution made out of a general fund from union dues for a political or a particular political broadcast.

The Second Circuit also reviews the case of United States v. Construction and General Laborers Local Union, D.C., 101 F.Supp. 869, which also touches upon a de minimus theory, which holds that contributions paid by the union out of dues to help finance the campaign were not even within the purview of the act.

The decisions of the District Courts are not of course binding upon this Court but they are persuasive. The decision of the Circuit Court is likewise not binding but most persuasive unless the Ninth Circuit has spoken otherwise.

The decision of the District Court for the Eastern District of Michigan in the case of United States v. International Union of United Automobile Workers, supra, was reversed by the Supreme Court in the case of United States v. International Union United Auto Workers, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563, holding that the word "expenditures," added to the statute in addition to the previous language of "contributions," included the use of union dues to sponsor commercial television broadcasts designed to influence the electorate to select certain candidates for Congress in connection with the 1954 elections (at page 585, 77 S.Ct. 529).

The attention of the Court has been called particularly to the language of Mr. Justice Frankfurter, on page 592, 77 S.Ct. on page 542 of this opinion, in which he suggests the elements that are necessary. The most important of these elements for consideration here is whether or not the broadcast complained of was paid for out of the general union dues of the union membership or whether the funds may "be fairly said to have been obtained on a voluntary basis."

Now, the evidence here is very clear that the broadcasts were paid for by the Anchorage Central Labor Council largely from what is called TV contributions made by the several unions, who are members of the Council, to the Council for the purpose of financing not this particular program or programs but the entire broadcast programs conducted over a period up to that time of some three years, which are, obviously, purely voluntary. In fact, that was the testimony of the Government's witnesses. No union was called upon to pay for this program. Each union decided by a vote of its membership, according to the testimony, first, whether they would contribute, and, second, how much. Surely, that is voluntary; and that, I think, is the crux of the situation here.

Now, the testimony also showed that the cost of the program sometimes went in the red, that is, that the monies collected from the unions for the program were insufficient to pay the entire cost, in which case the deficit was made up out of the union funds received from the per capita tax imposed on the unions. However, it does appear from the evidence that the amount so contributed was proportionately small; and it also definitely appears from the exhibit introduced, as to the amount that was collected by the Council, and from the testimony of the officers of the several unions, that the amounts paid into the Council for this program in 1958 were far in excess

of the cost of these political broadcasts, which amounted to $244. That is $61, I believe, each for four broadcasts. The amounts paid by individual unions far exceeded that. And so I cannot find that the proof is that the amounts of these programs were paid for by per capita tax; and, even if they were, the evidence indicates that the amount at least of the per capita tax was voluntary. No union need belong to the Council. They may for their mutual benefit. If they do, they pay a per capita tax of ten cents per member. But the evidence of the Government's witnesses is that that tax is not enforced. Each union can decide how much it can afford to pay. If a union has a thousand members it can pay a per capita tax on five hundred if it chooses, which or course is at least partially voluntary, and I would say it is voluntary.

The question also arises as to the source of the funds of the several unions contributing to the program and whether or not the statute is intended to include such indirect contributions. The testimony showed that some, at least, of the unions had sources of income other than dues, as for example rental of property owned by the union or interest on savings accounts or bonds, and that these funds were commingled into one general fund, such that it would be impossible to say whether the TV contributions and the per capita tax were paid out of dues or other income. Moreover, I have not considered the source of these funds controlling, as the unlawful expenditure here charged was made by the Council, and not by member unions, who are not so accused.

So, tested by that essential element of the offense charged, it seems very clear to me that the evidence fails to prove expenditure of funds prohibited by this statute.

Now, one of the next elements is whether the broadcast reached the public at large. It is obvious that the broadcast over television would reach to some extent the public at large, according to the survey made some perhaps twenty-five or twenty-six per cent of the television users.

But we have here another problem, that is clearly indicated in the decisions of the courts, that the media used in this broadcast was maintained by the union in its regular course as the only means the union had or the Council had or put forth to communicate with its members. The evidence is that the cost would be considerably less than trying to get out a newspaper to all of the members of the some twenty-five or twenty-six unions belonging to the Council. It seems clear to me, from decisions interpreting this statute, that under such a circumstance the fact that the broadcast was communicated to the general public does not bring the acts clearly within the prohibition of the statute where such media was used in the regular course of the union activities upon voluntary contributions by the unions for such programs.

Another element of the offense as suggested by Mr. Justice Sutherland in the Auto Workers case, is whether or not the broadcasts constituted active electioneering or simply stated the record of particular candidates on economic issues, and whether or not the Council sponsored the broadcast with the intent to affect the results of the election. That the broadcasts constituted "political advocacy" as charged in the indictment there can be no doubt. Although they made scant reference to either political party, they did criticize the fitness of three of the candidates for Senator and Representative upon their "record." It was also shown by a statement made by the president of the Council that the broadcasts were intended to reach the general public as well as union members, which in fact could not have been avoided on the television broadcast. However, this fact does not, under the decisions of the courts, come within the prohibition of the statute unless it be shown that the broadcasts were paid for out of union dues and were not the result of voluntary contributions of the member unions.

Now, let's look, if I may take a moment, at the purposes of the statute, which are clearly expressed in these quoted decisions, and in the debates before Congress. There are two, really: First, to prevent corporations and labor unions with their power and their wealth from controlling elections, in the public interest; and, second, to protect the union member from having union officials endorse candidates or attempt to influence voters which may be contrary to the wishes of the individual member. Tested by those principles, in accordance with the decisions of the courts reviewed, I cannot find that the broadcast is, or was an act to control an election. And, so far as the consent of the members is concerned, it is clear that each union, the membership of the union, if you please, voted to contribute these funds to the program, so the matter of the protection of the union member, which is one purpose of the statute, is not here involved.

Again, I think the principal point in this particular case is whether or not these broadcasts were the result of voluntary contributions to the TV fund of the Council, and I must conclude that they were and that the statute was not designed to prohibit the type of activity disclosed by the evidence in this case, in accordance with the decisions of the courts. Now, it may well be that such decisions render virtually impossible the enforcement of the statute, which is true in cases such as this, but I am in accord with counsel that it is not the intent that the statute cover cases such as this any more than a newspaper, which is a corporation or published by a corporation, containing editorials favoring or disfavoring political candidates.

I am not touching upon the constitutional question involved because I find it is not necessary to a decision in this case.

The Court must conclude, therefore, that the motion for a judgment of acquittal must be granted, and it will be so ordered.