# UNITED STATES *v.* INTERNATIONAL UNION UNITED AUTOMOBILE, AIRCRAFT AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW–CIO).

No. 44. Argued December 3–4, 1956.—Decided March 11, 1957.

*Solicitor General Rankin* argued the cause for the United States. With him on the brief were *Assistant Attorney General Olney, Beatrice Rosenberg* and *Carl H. Imlay.*

*Joseph L. Rauh, Jr.* argued the cause for appellee. With him on the brief were *Harold A. Cranefield, John Silard, Norma Zarky, Kurt Hanslowe* and *Redmond H. Roche, Jr.*

Mr. Justice Frankfurter delivered the opinion of the Court.

The issues tendered in this case are the construction and, ultimately, the constitutionality of 18 U. S. C. § 610, an Act of Congress that prohibits corporations and labor organizations from making "a contribution or expenditure in connection with" any election for federal office. This is a direct appeal by the Government from a judgment of the District Court for the Eastern District of Michigan dismissing a four-count indictment that charged appellee, a labor organization, with having made expenditures in violation of that law. Appellee had moved to dismiss the indictment on the grounds (1) that it failed to state an offense under the statute and (2) that the provisions of the statute "on their face and as construed and applied" are unconstitutional. The district judge held that the indictment did not allege a statutory offense and that he was therefore not required to rule upon the constitutional questions presented. 138 F. Supp. 53. The case came here, 351 U. S. 904, under the Criminal Appeals Act of 1907, as amended, 18 U. S. C. § 3731.

It is desirable at the outset to quote the statute in its entirety:

"It is unlawful for any national bank, or any corporation organized by authority of any law of

Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, and any person who accepts or receives any contribution, in violation of this section, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if the violation was willful, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

"For the purposes of this section 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes,

wages, rates of pay, hours of employment, or conditions of work." 18 U. S. C. § 610, taken from the Act of June 23, 1947, 61 Stat. 136, 159.

Appreciation of the circumstances that begot this statute is necessary for its understanding, and understanding of it is necessary for adjudication of the legal problems before us. Speaking broadly, what is involved here is the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process. This case thus raises issues not less than basic to a democratic society.

The concentration of wealth consequent upon the industrial expansion in the post-Civil War era had profound implications for American life. The impact of the abuses resulting from this concentration gradually made itself felt by a rising tide of reform protest in the last decade of the nineteenth century. The Sherman Law was a response to the felt threat to economic freedom created by enormous industrial combines. The income tax law of 1894 reflected congressional concern over the growing disparity of income between the many and the few.

No less lively, although slower to evoke federal action, was popular feeling that aggregated capital unduly influenced politics, an influence not stopping short of corruption. The matter is not exaggerated by two leading historians:

> "The nation was fabulously rich but its wealth was gravitating rapidly into the hands of a small portion of the population, and the power of wealth threatened to undermine the political integrity of the Republic." 2 Morison and Commager, The Growth of the American Republic (4th ed. 1950), 355.

In the '90's many States passed laws requiring candidates for office and their political committees to make public

the sources and amounts of contributions to their campaign funds and the recipients and amounts of their campaign expenditures. The theory behind these laws was that the spotlight of publicity would discourage corporations from making political contributions and would thereby end their control over party policies. But these state publicity laws either became dead letters or were found to be futile. As early as 1894, the sober-minded Elihu Root saw the need for more effective legislation. He urged the Constitutional Convention of the State of New York to prohibit political contributions by corporations:

> "The idea is to prevent . . . the great railroad companies, the great insurance companies, the great telephone companies, the great aggregations of wealth from using their corporate funds, directly or indirectly, to send members of the legislature to these halls in order to vote for their protection and the advancement of their interests as against those of the public. It strikes at a constantly growing evil which has done more to shake the confidence of the plain people of small means of this country in our political institutions than any other practice which has ever obtained since the foundation of our Government. And I believe that the time has come when something ought to be done to put a check to the giving of $50,000 or $100,000 by a great corporation toward political purposes upon the understanding that a debt is created from a political party to it." Quoted in Hearings before House Committee on Elections, 59th Cong., 1st Sess. 12; see Root, Addresses on Government and Citizenship (Bacon and Scott ed. 1916), 143.

Concern over the size and source of campaign funds so actively entered the presidential campaign of 1904

that it crystallized popular sentiment for federal action to purge national politics of what was conceived to be the pernicious influence of "big money" campaign contributions. A few days after the election of 1904, the defeated candidate for the presidency said:

> "The greatest moral question which now confronts us is, Shall the trusts and corporations be prevented from contributing money to control or aid in controlling elections?" Quoted, Hearings, *supra,* at 56.

President Theodore Roosevelt quickly responded to this national mood. In his annual message to Congress on December 5, 1905, he recommended that:

> "All contributions by corporations to any political committee or for any political purpose should be forbidden by law; directors should not be permitted to use stockholders' money for such purposes; and, moreover, a prohibition of this kind would be, as far as it went, an effective method of stopping the evils aimed at in corrupt practices acts." 40 Cong. Rec. 96.

Grist was added to the reformers' mill by the investigation of the great life insurance companies conducted by the Joint Committee of the New York Legislature, the Armstrong Committee, under the guidance of Charles Evans Hughes. The Committee's report, filed early in 1906, revealed that one insurance company alone had contributed almost $50,000 to a national campaign committee in 1904 and had given substantial amounts in preceding presidential campaigns. The Committee concluded:

> "Contributions by insurance corporations for political purposes should be strictly forbidden. Neither executive officers nor directors should be allowed to use the moneys paid for purposes of insurance in support of political candidates or platforms. . . .

Whether made for the purpose of supporting political views or with the desire to obtain protection for the corporation, these contributions have been wholly unjustifiable. In the one case executive officers have sought to impose their political views upon a constituency of divergent convictions, and in the other they have been guilty of a serious offense against public morals. The frank admission that moneys have been obtained for use in State campaigns upon the expectation that candidates thus aided in their election would support the interests of the companies, has exposed both those who solicited the contributions and those who made them to severe and just condemnation." Report of the Joint Committee of the Senate and Assembly of the State of New York Appointed to Investigate the Affairs of Life Insurance Companies, 397 (1906).

Less than a month later the Committee on Elections of the House of Representatives began considering a number of proposals designed to cleanse the political process. Some bills prohibited political contributions by certain classes of corporations; some merely required disclosure of contributions; and others made bribery at elections a federal crime. The feeling of articulate reform groups was reflected at a public hearing held by the Committee. Perry Belmont, leader of a nation-wide organization advocating a federal publicity bill, stated:

". . . this thing has come to the breaking point. We have had enough of it. We don't want any more secret purchase of organizations, which nullifies platforms, nullifies political utterances and the pledges made by political leaders in and out of Congress." Hearings before House Committee on Elections, 59th Cong., 1st Sess. 12.

574

This view found strong support in the testimony of Samuel Gompers, President of the American Federation of Labor, who said, with respect to the publicity bill:

"Whether this bill meets all of the needs may be questioned; that is open to discussion; but the necessity for some law upon the subject is patent to every man who hopes for the maintenance of the institutions under which we live. It is doubtful to my mind if the contributions and expenditures of vast sums of money in the nominations and elections for our public offices can continue to increase without endangering the endurance of our Republic in its purity and in its essence.

". . . If the interests of any people are threatened by corruption in our public life or corruption in elections, surely it must of necessity be those, that large class of people, whom we for convenience term the wageworkers.

"I am not in a mood, and never am, to indulge in denunciations or criticism, but it does come to me sometimes that one of the reasons for the absence of legislation of a liberal or sympathetic or just character, so far as it affects the interest of the wage-earners of America, can be fairly well traced with the growth of the corruption funds and the influences that are in operation during elections and campaigns . . . . I am under the impression that the patience of the American workingmen is about exhausted—

. . . . .

". . . [If] we are really determined that our elections shall be free from the power of money and its lavish use and expenditure without an accounting to the conscience and the judgment of the people of America, we will have to pass some measure of this kind." *Id.*, at 28–31.

President Roosevelt's annual message of 1906 listed as the first item of congressional business a law prohibiting political contributions by corporations. 41 Cong. Rec. 22. Shortly thereafter, in 1907, Congress provided:

> "That it shall be unlawful for any national bank, or any corporation organized by authority of any laws of Congress, to make a money contribution in connection with any election to any political office. It shall also be unlawful for any corporation whatever to make a money contribution in connection with any election at which Presidential and Vice-Presidential electors or a Representative in Congress is to be voted for or any election by any State legislature of a United States Senator." 34 Stat. 864.

As the historical background of this statute indicates, its aim was not merely to prevent the subversion of the integrity of the electoral process. Its underlying philosophy was to sustain the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government.

This Act of 1907 was merely the first concrete manifestation of a continuing congressional concern for elections "free from the power of money." (See statement of Samuel Gompers, *supra*.) The 1909 Congress witnessed unsuccessful attempts to amend the Act to proscribe the contribution of anything of value and to extend its application to the election of state legislatures. The Congress of 1910 translated popular demand for further curbs upon the political power of wealth into a publicity law that required committees operating to influence the results of congressional elections in two or more States to report all contributions and disbursements and to identify contributors and recipients of substantial sums. That law also required persons who spent more than $50 annually

for the purpose of influencing congressional elections in more than one State to report those expenditures if they were not made through a political committee. 36 Stat. 822. At the next session that Act was extended to require all candidates for the Senate and the House of Representatives to make detailed reports with respect to both nominating and election campaigns. The amendment also placed maximum limits on the amounts that congressional candidates could spend in seeking nomination and election, and forbade them from promising employment for the purpose of obtaining support. 37 Stat. 25. And in 1918 Congress made it unlawful either to offer or to solicit anything of value to influence voting. 40 Stat. 1013.

This Court's decision in *Newberry* v. *United States,* 256 U. S. 232, invalidating federal regulation of Senate primary elections, led to the Federal Corrupt Practices Act of 1925, 43 Stat. 1070, a comprehensive revision of existing legislation. The debates preceding that Act's passage reveal an attitude important to an understanding of the course of this legislation. Thus, Senator Robinson, one of the leaders of the Senate, said:

> "We all know . . . that one of the great political evils of the time is the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions. Many believe that when an individual or association of individuals makes large contributions for the purpose of aiding candidates of political parties in winning the elections, they expect, and sometimes demand, and occasionally, at least, receive, consideration by the beneficiaries of their contributions which not infrequently is harmful to the general public interest. It is unquestionably

an evil which ought to be dealt with, and dealt with intelligently and effectively." 65 Cong. Rec. 9507–9508.

One of the means chosen by Congress to deal with this evil was § 313 of the 1925 Act, which strengthened the 1907 statute (1) by changing the phrase "money contribution" to "contribution" (§ 302 (d) defined "contribution" broadly); (2) by extending the prohibition on corporate contributions to the election to Congress of Delegates and Resident Commissioners; and (3) by penalizing the recipient of any forbidden contribution as well as the contributor.

When, in 1940, Congress moved to extend the Hatch Act, 53 Stat. 1147, which was designed to free the political process of the abuses deemed to accompany the operation of a vast civil administration, its reforming zeal also led Congress to place further restrictions upon the political potentialities of wealth. Section 20 of the law amending the Hatch Act made it unlawful for any "political committee," as defined in the Act of 1925, to receive contributions of more than $3,000,000 or to make expenditures of more than that amount in any calendar year. And § 13 made it unlawful "for any person, directly or indirectly, to make contributions in an aggregate amount in excess of $5,000, during any calendar year, or in connection with any campaign for nomination or election, to or on behalf of any candidate for an elective Federal office" or any committee supporting such a candidate. The term "person" was defined to include any committee, association, organization or other group of persons. 54 Stat. 767. In offering § 13 from the Senate floor Senator Bankhead said:

"We all know that money is the chief source of corruption. We all know that large contributions

to political campaigns not only put the political
party under obligation to the large contributors, who
demand pay in the way of legislation, but we also
know that large sums of money are used for the
purpose of conducting expensive campaigns through
the newspapers and over the radio; in the publication
of all sorts of literature, true and untrue; and for
the purpose of paying the expenses of campaigners
sent out into the country to spread propaganda, both
true and untrue." 86 Cong. Rec. 2720.

The need for unprecedented economic mobilization
propelled by World War II enormously stimulated the
power of organized labor and soon aroused consciousness
of its power outside its ranks. Wartime strikes gave rise
to fears of the new concentration of power represented by
the gains of trade unionism. And so the belief grew that,
just as the great corporations had made huge political
contributions to influence governmental action or inac-
tion, whether consciously or unconsciously, the powerful
unions were pursuing a similar course, and with the
same untoward consequences for the democratic process.
Thus, in 1943, when Congress passed the Smith-Connally
Act to secure defense production against work stoppages,
contained therein was a provision extending to labor
organizations, for the duration of the war, § 313 of the
Corrupt Practices Act. 57 Stat. 163, 167. The testimony
of Congressman Landis, author of this measure, before a
subcommittee of the House Committee on Labor makes
plain the dominant concern that evoked it:

"The fact that a hearing has been granted is a high
tribute to the ability of the Labor Committee to
recognize the fact that public opinion toward the
conduct of labor unions is rapidly undergoing a
change. The public thinks, and has a right to think,
that labor unions, as public institutions should be

granted the same rights and no greater rights than any other public group. My bill seeks to put labor unions on exactly the same basis, insofar as their financial activities are concerned, as corporations have been on for many years.

. . . . .

". . . One of the matters upon which I sensed that the public was taking a stand opposite to that of labor leaders was the question of the handling of funds of labor organizations. The public was aroused by many rumors of huge war chests being maintained by labor unions, of enormous fees and dues being extorted from war workers, of political contributions to parties and candidates which later were held as clubs over the head of high Federal officials.

. . . . .

". . . The source of much of the national trouble today in the coal strike situation is that ill-advised political contribution of another day [referring, apparently, to the reported contribution of over $400,-000 by the United Mine Workers in the 1936 campaign, see S. Rep. No. 151, 75th Cong., 1st Sess.]. If the provision of my bill against such an activity has [sic] been in force when that contribution was made, the Nation, the administration, and the labor unions would be better off." Hearings before a Subcommittee of the House Committee on Labor on H. R. 804 and H. R. 1483, 78th Cong., 1st Sess. 1, 2, 4.

Despite § 313's wartime application to labor organizations Congress was advised of enormous financial outlays said to have been made by some unions in connection with the national elections of 1944. The Senate's Special Committee on Campaign Expenditures investigated, *inter alia,* the role of the Political Action Committee of the Congress of Industrial Organizations. The Committee

found "no clear-cut violation of the Corrupt Practices Act on the part of the Political Action Committee" on the ground that it had made direct contributions only to candidates and political committees involved in state and local elections and federal primaries, to which the Act did not apply, and had limited its participation in federal elections to political "expenditures," as distinguished from "contributions" to candidates or committees. S. Rep. No. 101, 79th Cong., 1st Sess. 23. The Committee also investigated, on complaint of Senator Taft, the Ohio C. I. O. Council's distribution to the public at large of 200,000 copies of a pamphlet opposing the re-election of Senator Taft and supporting his rival. In response to the C. I. O.'s assertion that this was not a proscribed "contribution" but merely an "expenditure of its own funds to state its position to the world, exercising its right of free speech . . . ," the Committee requested the Department of Justice to bring a test case on these facts. *Id.,* at 59. It also recommended extension of § 313 to cover primary campaigns and nominating conventions. *Id.,* at 81. A minority of the Committee, Senators Ball and Ferguson, advocated further amendment of § 313 to proscribe "expenditures" as well as "contributions" in order to avoid the possibility of emasculation of the statutory policy through a narrow judicial construction of "contributions." *Id.,* at 83.

The 1945 Report of the House Special Committee to Investigate Campaign Expenditures expressed concern over the vast amounts that some labor organizations were devoting to politics:

> "The scale of operations of some of these organizations is impressive. Without exception, they operate on a Nation-wide basis; and many of them have affiliated local organizations. One was found to have an annual budget for 'educational' work ap-

proximating $1,500,000, and among other things regularly supplies over 500 radio stations with 'briefs for broadcasters.' Another, with an annual budget of over $300,000 for political 'education,' has distributed some 80,000,000 pieces of literature, including a quarter million copies of one article. Another, representing an organized labor membership of 5,000,000, has raised $700,000 for its national organizations in union contributions for political 'education' in a few months, and a great deal more has been raised for the same purpose and expended by its local organizations." H. R. Rep. No. 2093, 78th Cong., 2d Sess. 3.

Like the Senate Committee, it advocated extension of § 313 to primaries and nominating conventions, *id.*, at 9, and noted the existence of a controversy over the scope of "contribution." *Id.*, at 11. The following year the House Committee made a further study of the activities of organizations attempting to influence the outcome of federal elections. It found that the Brotherhood of Railway Trainmen and other groups employed professional political organizers, sponsored partisan radio programs and distributed campaign literature. H. R. Rep. No. 2739, 79th Cong., 2d Sess. 36–37. It concluded that:

"The intent and purpose of the provision of the act prohibiting any corporation òr labor organization making any contribution in connection with any election would be wholly defeated if it were assumed that the term 'making any contribution' related only to the donating of money directly to a candidate, and excluded the vast expenditures of money in the activities herein shown to be engaged in extensively. Of what avail would a law be to prohibit the contributing direct to a candidate and yet permit the expenditure of large sums in his behalf?

"The committee is firmly convinced, after a thorough study of the provisions of the act, the legislative history of the same, and the debates on the said provisions when it was pending before the House, that the act was intended to prohibit such expenditures." *Id.*, at 40.

Accordingly, to prevent further evasion of the statutory policy, the Committee attached to its recommendation that the prohibition of contributions by labor organizations be made permanent the additional proposal that the statute

"be clarified so as to specifically provide that expenditures of money for salaries to organizers, purchase of radio time, and other expenditures by the prohibited organizations in connection with elections, constitute violations of the provisions of said section, whether or not said expenditures are with or without the knowledge or consent of the candidates." *Id.*, at 46. (Italics omitted.)

Early in 1947 the Special Committee to Investigate Senatorial Campaign Expenditures in the 1946 elections, the Ellender Committee, urged similar action to "plug the existing loophole," S. Rep. No. 1, Part 2, 80th Cong., 1st Sess. 38–39, and Senator Ellender introduced a bill to that effect.

Shortly thereafter, Congress again acted to protect the political process from what it deemed to be the corroding effect of money employed in elections by aggregated power. Section 304 of the labor bill introduced into the House by Representative Hartley in 1947, like the Ellender bill, embodied the changes recommended in the reports of the Senate and House Committees on Campaign Expenditures. It sought to amend § 313 of the Corrupt Practices Act to proscribe any "expenditure" as well

as "any contribution," to make permanent § 313's application to labor organizations and to extend its coverage to federal primaries and nominating conventions. The Report of the House Committee on Education and Labor, which considered and approved the Hartley bill, merely summarized § 304, H. R. Rep. No. 245, 80th Cong., 1st Sess. 46, and this section gave rise to little debate in the House. See 93 Cong. Rec. 3428, 3522. Because no similar measure was in the labor bill introduced by Senator Taft, the Senate as a whole did not consider the provisions of § 304 until they had been adopted by the Conference Committee. In explaining § 304 to his colleagues, Senator Taft, who was one of the conferees, said:

"I may say that the amendment is in exactly the same words which were recommended by the Ellender committee, which investigated expenditures by Senators in the last election. . . . In this instance the words of the Smith-Connally Act have been somewhat changed in effect so as to plug up a loophole which obviously developed, and which, if the courts had permitted advantage to be taken of it, as a matter of fact, would absolutely have destroyed the prohibition against political advertising by corporations. If 'contribution' does not mean 'expenditure,' then a candidate for office could have his corporation friends publish an advertisement for him in the newspapers every day for a month before election. I do not think the law contemplated such a thing, but it was claimed that it did, at least when it applied to labor organizations. So, all we are doing here is plugging up the hole which developed, following the recommendation by our own Elections Committee, in the Ellender bill." 93 Cong. Rec. 6439.

584

After considerable debate, the conference version was approved by the Senate, and the bill subsequently became law despite the President's veto. It is this section of the statute that the District Court held did not reach the activities alleged in the indictment.

On review under the Criminal Appeals Act of a district court judgment dismissing an indictment on the basis of statutory interpretation, this Court must take the indictment as it was construed by the district judge. *United States* v. *Borden Co.,* 308 U. S. 188. The court below summarized the allegations of the indictment at the outset of its opinion:

> "Here the specific charge is that the 'expenditure' violation came in connection with the selection of candidates for a senator and representatives to the United States Congress during the 1954 primary and general elections. It is alleged that defendant paid a specific amount from its general treasury fund to Luckoff and Wayburn Productions, Detroit, Michigan, to defray the costs of certain television broadcasts sponsored by the Union from commercial television station WJBK.

> "It is charged that the broadcasts urged and endorsed selection of certain persons to be candidates for representatives and senator to the Congress of the United States and included expressions of political advocacy intended by defendant to influence the electorate and to affect the results of the election.

> "It is further charged that the fund used came from the Union's dues, was not obtained by voluntary political contributions or subscriptions from members of the Union, and was not paid for by advertising or sales." 138 F. Supp., at 54.

Thus, for our purposes, the indictment charged appellee with having used union dues to sponsor commercial television broadcasts designed to influence the electorate to select certain candidates for Congress in connection with the 1954 elections.

To deny that such activity, either on the part of a corporation or a labor organization, constituted an "expenditure in connection with any [federal] election" is to deny the long series of congressional efforts calculated to avoid the deleterious influences on federal elections resulting from the use of money by those who exercise control over large aggregations of capital. More particularly, this Court would have to ignore the history of the statute from the time it was first made applicable to labor organizations. As indicated by the reports of the Congressional Committees that investigated campaign expenditures, it was to embrace precisely the kind of indirect contribution alleged in the indictment that Congress amended § 313 to proscribe "expenditures." It is open to the Government to prove under this indictment activity by appellee that, except for an irrelevant difference in the medium of communication employed, is virtually indistinguishable from the Brotherhood of Railway Trainmen's purchase of radio time to sponsor candidates or the Ohio C. I. O.'s general distribution of pamphlets to oppose Senator Taft. Because such conduct was claimed to be merely "an expenditure [by the union] of its own funds to state its position to the world," the Senate and House Committees recommended and Congress enacted, as we have seen, the prohibition of "expenditures" as well as "contributions" to "plug the existing loophole."

Although not entitled to the same weight as these carefully considered committee reports, the Senate debate preceding the passage of the Taft-Hartley Act confirms

what these reports demonstrate. A colloquy between Senator Taft and Senator Pepper dealt with the problem confronting us:

> "Mr. Pepper. Does what the Senator has said in the past also apply to a radio speech? If a national labor union, for example, should believe that it was in the public interest to elect the Democratic Party instead of the Republican Party, or vice versa, would it be forbidden by this proposed act to pay for any radio time, for anybody to make a speech that would express to the people the point of view of that organization?
>
> "Mr. Taft. If it contributed its own funds to get somebody to make the speech, I would say they would violate the law.
>
> "Mr. Pepper. If they paid for the radio time?
>
> "Mr. Taft. If they are simply giving the time, I would say not; I would say that is in the course of their regular business.
>
> "Mr. Pepper. What I mean is this: I was not assuming that the radio station was owned by the labor organization. Suppose that in the 1948 campaign, Mr. William Green, as president of the American Federation of Labor, should believe it to be in the interest of his membership to go on the radio and support one party or the other in the national election, and should use American Federation of Labor funds to pay for the radio time. Would that be an expenditure which is forbidden to a labor organization under the statute?
>
> "Mr. Taft. Yes." 93 Cong. Rec. 6439.

The discussion that followed, while suggesting that difficult questions might arise as to whether or not a particular broadcast fell within the statute, buttresses the conclusion that § 304 was understood to proscribe

the expenditure of union dues to pay for commercial broadcasts that are designed to urge the public to elect a certain candidate or party.[1]

---

[1] "Mr. BARKLEY. Suppose a certain corporation, for instance, the corporation that makes Bayer aspirin, or Jergens lotion, or any other well-advertised product, employs a commentator to talk about various things, winding up with an advertisement of the product, and suppose that the radio commentator from day to day takes advantage of his employment or his sponsorship to make comments which are calculated to influence the opinions of men or women as to political candidates. Would the corporation sponsoring the particular commentator be violating the law?

"Mr. TAFT. I should have to know the exact facts. If, for instance, apart from commentators and the radio, and taking the case of a paid advertisement, suppose a corporation advertises its products, and that every day for 2 weeks before the election it advertises a candidate. I should say that would be a violation of the law. I would say the same thing probably would be true of a radio broadcast of that kind, under certain circumstances, but I think I should like to know the exact facts before expressing an opinion.

"Mr. BARKLEY. In the case of a commentator who is paid to advertise a certain product, and who in the course of his 15 minutes on the radio may also seek to influence votes, the sponsor may say, either before or after the broadcast, that he is not responsible for what the commentary says; yet he is paying the commentator for his broadcast. Would that still be a violation of law, although the sponsor might excuse himself or attempt to excuse himself by saying he was not responsible for the opinions expressed by the commentator?

"Mr. TAFT. I think there are all degrees. It would be for a court to decide. I think as a matter of fact, if that had happened under the old law, there would have been the same question.

"I want to make the point that we are not raising any new questions here. Those same questions could have been raised with respect to corporations during the past 25 years. It is a question of fact: Was the corporation using its money to influence a political election?

. . . . .

"Mr. MAGNUSON. Let us consider the teamsters. Suppose they have a weekly radio program, as, indeed, they have had for a long time back. Or let us say the AFL has such a radio program.

*United States* v. *C. I. O.*, 335 U. S. 106, presented a different situation. The decision in that case rested on the Court's reading of an indictment that charged defend-

---

Let us assume I am running for office and they ask me to be a guest on their program. Suppose I talk on the subject of labor and do not advocate my own candidacy. Nevertheless I am on that program. My name is being advertised and I am being heard by many thousands of people. Would that be an unlawful contribution to my candidacy?

"Mr. TAFT. If a labor organization is using the funds provided by its members through payment of union dues to put speakers on the radio for Mr. X against Mr. Y, that should be a violation of the law.

"Mr. MAGNUSON. They are not paying me anything. They have asked me to be a guest.

"Mr. TAFT. I understand, but they are paying for the time on the air. Of course, in each case there is a question of fact to be decided. I cannot answer various hypotheses without knowing all the circumstances. But in each case the question is whether or not a union or a corporation is making a contribution or expenditure of funds to elect A as against B. Labor unions are supposed to keep out of politics in the same way that corporations are supposed to keep out of politics." 93 Cong. Rec. 6439–6440.

"Mr. TAYLOR. . . . Take the matter of a radio program sponsored by either a union or a corporation. I think the AFL or the CIO, one or the other, has a news commentator who comments on the news. Could he comment on political candidates favorably or unfavorably?

"Mr. TAFT. If the General Motors Corp. had a man speaking on the radio every week to advocate the election of a Republican or a Democratic Presidential candidate, the corporation ought to be punished, and it would be punished under the law. Labor organizations should be subject to the same rule.

"Mr. TAYLOR. That is altogether different. It is a more subtle thing. When a commentator is broadcasting the news every day he can do a lot more good or harm to a man by coloring his broadcast and presenting it in the guise of a news commentary than he could openly.

"Mr. TAFT. The Senator is right. It is a question of fact which would have to be raised in every case. Is it a contribution to a candidate or is it not? Possibly a knock is a boost sometimes. That argument might well be made by a person who was taking part in an election." 93 Cong. Rec. 6447.

ants with having distributed only to union members or purchasers an issue, Vol. 10, No. 28, of "The CIO News," a weekly newspaper owned and published by the C. I. O. That issue contained a statement by the C. I. O. president urging all members of the C. I. O. to vote for a certain candidate. Thus, unlike the union-sponsored political broadcast alleged in this case, the communication for which the defendants were indicted in *C. I. O.* was neither directed nor delivered to the public at large. The organization merely distributed its house organ to its own people. The evil at which Congress has struck in § 313 is the use of corporation or union funds to influence the public at large to vote for a particular candidate or a particular party.

Our holding that the District Court committed error when it dismissed the indictment for having failed to state an offense under the statute implies no disrespect for "the cardinal rule of construction, that where the language of an act will bear two interpretations, equally obvious, that one which is clearly in accordance with the provisions of the constitution is to be preferred." *Knights Templars' Indemnity Co.* v. *Jarman,* 187 U. S. 197, 205. The case before us does not call for its application. Here only one interpretation may be fairly derived from the relevant materials. The rule of construction to be invoked when constitutional problems lurk in an ambiguous statute does not permit disregard of what Congress commands.

Appellee urges that if, as we hold, 18 U. S. C. § 610 embraces the activity alleged in the indictment, it offends several rights guaranteed by the Constitution.[2] The Gov-

---

[2] ". . . if such an expenditure is prohibited by 18 U. S. C. 610, the statute violates the provisions of the Constitution of the United States in that the statute (i) abridges freedom of speech and of the press and the right peaceably to assemble and to petition; (ii) abridges the right to choose senators and representatives guaranteed by Article I, § 2 and the Seventeenth Amendment; (iii) creates an arbitrary and unlawful classification and discriminates against labor

ernment replies that the actual restraint upon union political activity imposed by the statute is so narrowly limited that Congress did not exceed its powers to protect the political process from undue influence of large aggregations of capital and to promote individual responsibility for democratic government. Once more we are confronted with the duty of being mindful of the conditions under which we may enter upon the delicate process of constitutional adjudication.

The impressive lesson of history confirms the wisdom of the repeated enunciation, the variously expressed admonition, of self-imposed inhibition against passing on the validity of an Act of Congress "unless absolutely necessary to a decision of the case." *Burton* v. *United States,* 196 U. S. 283, 295.[3] Observance of this principle makes for the minimum tension within our democratic political system where "Scarcely any question arises . . . which does not become, sooner or later, a subject of judicial debate." 1 De Tocqueville, Democracy in America (4th Am. ed. 1843), 306.

The wisdom of refraining from avoidable constitutional pronouncements has been most vividly demonstrated on the rare occasions when the Court, forgetting "the fallibility of the human judgment," [4] has departed from its own practice. The Court's failure in *Dred Scott*

---

organizations in violation of the Fifth Amendment, and (iv) is vague and indefinite and fails to provide a reasonably ascertainable standard of guilt in violation of the Fifth and Sixth Amendments." Brief for appellee, pp. 2–3.

[3] Cases are collected in the opinion of Mr. Justice Brandeis in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 345 *et seq.*

[4] "It must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility." 1 Cooley, Constitutional Limitations (8th ed.), 332.

v. *Sandford,* 19 How. 393, "to take the smooth handle for the sake of repose" by disposing of the case solely upon "the outside issue" and the effects of its attempt "to settle the agitation" are familiar history.[5] *Dred Scott* does not stand alone. These exceptions have rightly been characterized as among the Court's notable "self-inflicted wounds." Charles Evans Hughes, The Supreme Court of the United States, 50.

Clearly in this case it is not "absolutely necessary to a decision," *Burton* v. *United States, supra,* to canvass the constitutional issues. The case came here under the Criminal Appeals Act because the District Court blocked the prosecution on the ground that the indictment failed to state an offense within § 313 of the Corrupt Practices Act. Our reversal of the district judge's erroneous construction clears the way for the prosecution to proceed.

Refusal to anticipate constitutional questions is peculiarly appropriate in the circumstances of this case. First of all, these questions come to us unillumined by the consideration of a single judge—we are asked to decide them in the first instance. Again, only an adjudication on the merits can provide the concrete factual setting that sharpens the deliberative process especially demanded for constitutional decision. Finally, by remanding the case

---

[5] A letter written by Mr. Justice Catron to President Buchanan shortly before the decision was handed down reveals an attitude happily exceptional:

"Will you drop [Mr. Justice] Grier a line, saying how necessary it is—& how good the opportunity is, to settle the agitation by an affirmative decision of the Supreme Court, the one way or the other. He ought not to occupy so doubtful a ground as the outside issue—that admitting the constitutionality of the Mo. Comp. line of 1820, still, as no domicile was acquired by the negro at Ft. Snelling, & he returned to Missouri, he was not free. He has no doubt about the question on the main contest, but has been persuaded to take the smooth handle for the sake of repose." 10 Works of James Buchanan 106.

for trial it may well be that the Court will not be called upon to pass on the questions now raised. Compare *United States* v. *Petrillo*, 332 U. S. 1, 9 *et seq.*, with the subsequent adjudication on the merits in *United States* v. *Petrillo*, 75 F. Supp. 176.

Counsel are prone to shape litigation, so far as it is within their control, in order to secure comprehensive rulings. This is true both of counsel for defendants and for the Government. Such desire on their part is not difficult to appreciate. But the Court has its responsibility. Matter now buried under abstract constitutional issues may, by the elucidation of a trial, be brought to the surface, and in the outcome constitutional questions may disappear. Allegations of the indictment hypothetically framed to elicit a ruling from this Court or based upon misunderstanding of the facts may not survive the test of proof. For example, was the broadcast paid for out of the general dues of the union membership or may the funds be fairly said to have been obtained on a voluntary basis? Did the broadcast reach the public at large or only those affiliated with appellee? Did it constitute active electioneering or simply state the record of particular candidates on economic issues? Did the union sponsor the broadcast with the intent to affect the results of the election? As Senator Taft repeatedly recognized in the debate on § 304, prosecutions under the Act may present difficult questions of fact. See *supra*, pp. 585–587, n. 1. We suggest the possibility of such questions, not to imply answers to problems of statutory construction, but merely to indicate the covert issues that may be involved in this case.

Enough has been said to justify withholding determination of the more or less abstract issues of constitutional law. Because the District Court's erroneous interpretation of the statute led it to stop the prosecution pre-

maturely, its judgment must be reversed and the case must be remanded to it for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice Douglas, with whom The Chief Justice and Mr. Justice Black join, dissenting.

We deal here with a problem that is fundamental to the electoral process and to the operation of our democratic society. It is whether a union can express its views on the issues of an election and on the merits of the candidates, unrestrained and unfettered by the Congress. The principle at stake is not peculiar to unions. It is applicable as well to associations of manufacturers, retail and wholesale trade groups, consumers' leagues, farmers' unions, religious groups and every other association representing a segment of American life and taking an active part in our political campaigns and discussions. It is as important an issue as has come before the Court, for it reaches the very vitals of our system of government.

Under our Constitution it is We The People who are sovereign. The people have the final say. The legislators are their spokesmen. The people determine through their votes the destiny of the nation. It is therefore important—vitally important—that all channels of communication be open to them during every election, that no point of view be restrained or barred, and that the people have access to the views of every group in the community.

In *United States* v. *C. I. O.,* 335 U. S. 106, 144, Mr. Justice Rutledge spoke of the importance of the First Amendment rights—freedom of expression and freedom of assembly—to the integrity of our elections. "The most complete exercise of those rights," he said, "is essential to the full, fair and untrammeled operation of the electoral process. To the extent they are curtailed the

electorate is deprived of information, knowledge and opinion vital to its function."

What the Court does today greatly impairs those rights. It sustains an indictment charging no more than the use of union funds for broadcasting television programs that urge and endorse the selection of certain candidates for the Congress of the United States. The opinion of the Court places that advocacy in the setting of corrupt practices. The opinion generates an environment of evil-doing and points to the oppressions and misdeeds that have haunted elections in this country.

Making a speech endorsing a candidate for office does not, however, deserve to be identified with antisocial conduct. Until today political speech has never been considered a crime. The making of a political speech up to now has always been one of the preferred rights protected by the First Amendment. It usually costs money to communicate an idea to a large audience. But no one would seriously contend that the expenditure of money to print a newspaper deprives the publisher of freedom of the press. Nor can the fact that it costs money to make a speech—whether it be hiring a hall or purchasing time on the air—make the speech any the less an exercise of First Amendment rights. Yet this statute, as construed and applied in this indictment, makes criminal any "expenditure" by a union for the purpose of expressing its views on the issues of an election and the candidates. It would make no difference under this construction of the Act whether the union spokesman made his address from the platform of a hall, used a sound truck in the streets, or bought time on radio or television. In each case the mere "expenditure" of money to make the speech is an indictable offense. The principle applied today would make equally criminal the use by a union of its funds to print pamphlets for general distribution or to distribute political literature at large.

Can an Act so construed be constitutional in view of the command of the First Amendment that Congress shall make no law that abridges free speech or freedom of assembly?

The Court says that the answer on the constitutional issue must await the development of the facts at the trial.

It asks, "Did the broadcast reach the public at large or only those affiliated with appellee?" But the size of the audience has heretofore been deemed wholly irrelevant to First Amendment issues. One has a right to freedom of speech whether he talks to one person or to one thousand. One has a right to freedom of speech not only when he talks to his friends but also when he talks to the public. It is startling to learn that a union spokesman or the spokesman for a corporate interest has fewer constitutional rights when he talks to the public than when he talks to members of his group.

The Court asks whether the broadcast constituted "active electioneering" or simply stated "the record of particular candidates on economic issues." What possible difference can it make under the First Amendment whether it was one or the other? The First Amendment covers the entire spectrum. It protects the impassioned plea of the orator as much as the quiet publication of the tabulations of the statistician or economist. If there is an innuendo that "active electioneering" by union spokesmen is not covered by the First Amendment, the opinion makes a sharp break with our political and constitutional heritage.

The Court asks, "Did the union sponsor the broadcast with the intent to affect the results of the election?" The purpose of speech is not only to inform but to incite to action. As Mr. Justice Holmes said in his dissent in *Gitlow* v. *New York,* 268 U. S. 652, 673, "Every idea is an incitement. It offers itself for belief and if believed it

is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth." To draw a constitutional line between informing the people and inciting or persuading them and to suggest that one is protected and the other not by the First Amendment is to give constitutional dignity to an irrelevance. Any political speaker worth his salt intends to sway voters. His purpose to do so cannot possibly rob him of his First Amendment rights, unless we are to reduce that great guarantee of freedom to the protection of meaningless mouthings of ineffective speakers.

Finally, the Court asks whether the broadcast was "paid for out of the general dues of the union membership or may the funds be fairly said to have been obtained on a voluntary basis." Behind this question is the idea that there may be a minority of union members who are of a different political school than their leaders and who object to the use of their union dues to espouse one political view. This is a question that concerns the internal management of union affairs. To date, unions have operated under a rule of the majority. Perhaps minority rights need protection. But this way of doing it is, indeed, burning down the house to roast the pig. All union expenditures for political discourse are banned because a minority might object.

When the exercise of First Amendment rights is tangled with conduct which government may regulate, we refuse to allow the First Amendment rights to be sacrificed merely because some evil may result. Our insistence is that the regulatory measure be "narrowly drawn" to meet the evil that the government can control. *Cantwell* v. *Connecticut,* 310 U. S. 296, 311. Or as the Court said in *De Jonge* v. *Oregon,* 299 U. S. 353, 364–365, when speaking of First Amendment rights, ". . . the legislative intervention can find constitutional justification only by dealing

with the abuse. The rights themselves must not be curtailed."

If minorities need protection against the use of union funds for political speech-making, there are ways of reaching that end without denying the majority their First Amendment rights.[1]

First Amendment rights are not merely curtailed by the construction of the Act which the Court adopts. Today's ruling abolishes First Amendment rights on a wholesale basis. Protection of minority groups, if any, can be no excuse. The Act is not "narrowly drawn" to meet that abuse.

Some may think that one group or another should not express its views in an election because it is too powerful, because it advocates unpopular ideas, or because it has a record of lawless action. But these are not justifications for withholding First Amendment rights from any group—labor or corporate. Cf. *United States* v. *Rumely,* 345 U. S. 41. First Amendment rights are part of the heritage of all persons and groups in this country. They are not to be dispensed or withheld merely because we or the Congress thinks the person or group is worthy or unworthy.

These constitutional questions are so grave that the least we should do is to construe this Act, as we have in comparable situations (*United States* v. *C. I. O., supra;*

---

[1] There are alternative measures appropriate to cure this evil which Congress has seen in the expenditure of union funds for political purposes. The protection of union members from the use of their funds in supporting a cause with which they do not sympathize may be cured by permitting the minority to withdraw their funds from that activity. The English have long required labor unions to permit a dissenting union member to refuse to contribute funds for political purposes. Trade Union Act, 1913, 2 & 3 Geo. V, c. 30; Trade Disputes and Trade Unions Act, 1927, 17 & 18 Geo. V, c. 22; Trade Disputes and Trade Unions Act, 1946, 9 & 10 Geo. VI, c. 52.

*United States* v. *Rumely,* 345 U. S. 41; *United States* v. *Harriss,* 347 U. S. 612), to limit the word "expenditure" to activity that does not involve First Amendment rights.[2]

The Act, as construed and applied, is a broadside assault on the freedom of political expression guaranteed by the First Amendment. It cannot possibly be saved by any of the facts conjured up by the Court. The answers to the questions reserved are quite irrelevant to the constitutional questions tendered under the First Amendment.

I would affirm the judgment dismissing the indictment.

---

[2] If Congress is of the opinion that large contributions by labor unions to candidates for office and to political parties have had an undue influence upon the conduct of elections, it can prohibit such contributions. And, in expressing their views on the issues and candidates, labor unions can be required to acknowledge their authorship and support of those expressions. Undue influence, however, cannot constitutionally form the basis for making it unlawful for any segment of our society to express its views on the issues of a political campaign.