316 N.W.2d 524 (1982)
MINNESOTA ASSOCIATION OF COMMERCE AND INDUSTRY, Plaintiff,
v.
Tom FOLEY, Ramsey County Attorney, Defendant, and
Warren Spannaus, Attorney General, State of Minnesota, Intervening Defendant.
No. 81-440.
Supreme Court of Minnesota.
March 5, 1982.
*526 Thomas W. Foley, County Atty., Stephen F. Befort, Prin. Asst. County Atty., and Michele L. Timmons, Asst. County Atty., St. Paul, for Foley.
Warren Spannaus, Atty. Gen., Kent G. Harbison, Asst. Atty. Gen., and D. Douglas Blanke, Sp. Asst. Atty. Gen., St. Paul, for Spannaus.
Popham, Haik, Schnobrich, Kaufman & Doty and Bruce Willis, Minneapolis, for plaintiff.
Peterson, Engberg & Peterson, Roger A. Peterson and Jay Y. Benanav, Minneapolis, amicus curiae.
Heard, considered and decided by the court en banc.
SCOTT, Justice.
This case involves the certification of the following three questions to this court by the Federal District Court of Minnesota:
(1) Does Minn.Stat. § 210A.34 (1980) permit the establishment and maintenance of any form of corporate "political action committee," or "PAC"?
(2) Does Minn.Stat. § 72A.12, subd. 5 (1980), permit an insurance company or association to establish and maintain any form of "political action committee," or "PAC"?
(3) Do the prohibitions of Minn.Stat. § 210A.34 (1980) apply to nonprofit corporations?
The Minnesota Association of Commerce and Industry (MACI) is the plaintiff in an action pending before the Federal District Court. MACI, a Minnesota nonprofit corporation representing the interests of 2,600 members, challenges the constitutionality of the two statutes cited above in that action and has preserved that constitutional challenge in the federal court. Our sole function in this case is to answer the specific certified questions.
The relevant portions of the two statutes to be construed are as follows:
It shall be unlawful for any corporation doing business in this state to make any contribution or to offer, consent or agree to make any contribution, directly or indirectly, of any money, property, free service of its officers or employees or thing of value to any political party, organization, committee or individual to promote or defeat the candidacy of any person for nomination, election, or appointment to any political office. For the purpose of this subdivision, "contribution" includes an expenditure to promote or defeat the election or nomination of any candidate to any political office which is made with the authorization or expressed or implied consent of, or in cooperation or in concert with, or at the request or suggestion of a candidate, his principal campaign committee or his agent.
Minn.Stat. § 210A.34, subd. 1 (1980).
No insurance company or association, including fraternal beneficiary associations, doing business in this state, shall, directly or indirectly, pay or use, or offer, consent or agree to pay or use, any money or *527 property for or in aid of any political party, committee or organization, or for or in aid of any corporation, joint stock or other association organized or maintained for political purposes, or for or in aid of any candidate for political office, or for nomination for such office, or for any political purpose whatsoever, or for reimbursement or indemnification of any person for money or property so used. Any officer, director, stockholder, attorney or agent of any corporation or association which violates any of the provisions of this section, who participates in, aids, abets, or advises or consents to any such violation, and any person who solicits or knowingly receives any money or property in violation of this section, shall be guilty of a gross misdemeanor, and any officer aiding or abetting in any contribution made in violation of this section shall be liable to the company or association for the amount so contributed.
Minn.Stat. § 72A.12, subd. 5 (1980).
The parties agree that there are three forms of political action committees or "PAC's." The first type, partisan PAC's, are "separate funds collected and maintained by corporations or corporate committees, which not only provide all administrative support for the funds but also direct the payments out of the funds to political candidates designated by the sponsoring corporation." The second type of PAC is referred to by the parties as a "conduit" or "nonpartisan" PAC. In the conduit PAC, individual contributors, e.g., corporation employees, may specify the particular candidates to whom they wish to make a donation. The sponsoring organization, however, still provides free administrative (clerical, staff, physical space, accounting, etc.) support for the PAC. The third type of PAC is the "independent" PAC, which is sponsored by an organization in name only, but receives no direct or indirect subsidy from the sponsoring organization and only supports candidates designated by its contributors.
Each of the parties takes a different position on the permissibility under the state statutes of the three types of PAC's. On the third certified question concerning the applicability of Minn.Stat. § 210A.34 (1980) to nonprofit corporations, there is also a divergence of opinion. We answer the first two certified questions in the affirmative, as qualified, and the third in the negative.
1. Political action committees, or PAC's, take their name from an early entity established by the executive board of the Congress of Industrial Organizations (CIO) in 1943. Cf. Pipefitters Local 562 v. United States, 407 U.S. 385, 403-08, 92 S.Ct. 2247, 2258-61, 33 L.Ed.2d 11 (1972) (historical discussion). However, it would not be unfair to say that the PAC phenomenon "exploded" when federal campaign financing reforms of the 1970's created an environment in which PAC's could flourish.[1]See Alexander, The Obey-Railsback Bill: Its Genesis and Early History, 22 Ariz.L.Rev. 653, 653 (1980).
Though begun by a labor organization in the 1940's, the 1970's were the decade of the corporate PAC:
In 1970, there were some three hundred identifiable PAC's, most of which were affiliated with organized labor. * * *
Currently there are almost 2,500 PAC's registered with the Federal Election Commission [FEC] and uncounted others have filed with public bodies responsible for regulating state and local elections. * * * Of the PAC's registered with the FEC, 1,153 are affiliated with corporations, 290 are affiliated with labor unions, *528 and approximately 1,000 fall into other categories * * *. Conservatively, one-half of the PAC's in the other categories may be considered business-related PAC's.
Epstein, The PAC Phenomenon: An Overview, 22 Ariz.L.Rev. 355, 356 (1980) (footnote omitted).
When enacted originally in 1912, Act of June 20, 1912, ch. 3, § 26, 1912 Minn.Laws Ex.Sess. 34,[2] no explicit reference was made to political action committees as they are presently constituted, because they are a recent phenomenon. Subsequent amendments and recodifications of the statute also make no explicit provision for corporate PAC's.
Each of the parties to the appeal sets out the above statutes in his brief and then, through the selective use of highlighted language, attempts to show that the plain meaning of the statute supports his position. After reviewing the various interpretations, we are forced to conclude that Minn.Stat. § 645.16 (1980), a canon for construing legislative intent where the words are not explicit, must be used to resolve the debate.[3]
This court has only construed § 210A.34 or its precursors once since the original enactment in 1912. In LaBelle v. Hennepin County Bar Association, 206 Minn. 290, 288 N.W. 788 (1939), the court was asked to rule on the propriety of the Hennepin County Bar Association's publication of the results of a candidate preference poll that ascertained the members' preferences for local judiciary candidates. The LaBelle court found the statute applicable to the bar association but found no violation of the law, holding instead that payment of the expense of conducting the poll was not a payment to any particular candidate.
The defendant Ramsey County Attorney contends that LaBelle supports his position that conduit PAC's are not prohibited. He argues that LaBelle stands for the proposition that the legislative intent was not to prohibit conduit PAC's because, while administrative expenses in such PAC's are a thing of value, the money is not expended on behalf of a particular candidate; rather it is expended on behalf of any and all candidates whom individual members wish to aid. We concur with such an interpretation.
We find further support in Advisory Opinion No. 6 of the State Ethics Commission dated September 9, 1974. The Commission evaluated the First Bank System Minnesota Good Government Program and concluded that a conduit plan was permitted under the statute:
In this case, the corporation is expending its resources solely as an aid to the employee; and any benefit to any candidate or party receiving the contribution is merely coincidental with the employee's selection. The corporation's activity is purely neutral in character, and is intended purely to encourage political contributions by employees in general. It is only the employee's decision, and the employee's contribution, which operates to promote or influence the outcome of any particular election. In our opinion, therefore, it follows that the operation of the nonpartisan or conduit plan is not prohibited under the Minnesota law. The corporation *529 is not expending its resources to "promote" or "influence" the election of any candidate as those terms are used in the statutes.[4]
This Advisory Opinion seems consistent with the intention of the legislature in enacting the statute, as best as that intention can be ascertained after the passage of nearly 70 years since the original enactment.
Several articles in 1912 local newspapers are generally acknowledged to be the only evidence of the legislative intent at the time. The articles make it clear that the legislature was seeking to eliminate the use of "war chests" by the brewing industry to advance their corporate interests.
The Minn.Stat. § 645.16 (1980) factors, when applied, on balance also favor the Ramsey County Attorney's position. The occasion and necessity for the law, according to the national trend and the Minneapolis Journal articles, was to emasculate corporate influence, particularly that of the brewing interests, on the political process. The circumstances under which the law was enacted were a time of increased national concern over the corrupt practices and undue influence of large concentrations of corporate wealth accumulated at the turn of the century. See generally United States v. International Union United Automobile Workers, 352 U.S. 567, 570-580, 77 S.Ct. 529, 530-535, 1 L.Ed.2d 563 (1957). The mischief to be remedied by the statute was the disproportionate influence on the political process by corporate interests. The object to be obtained was "to insure the purity of elections." LaBelle v. Hennepin County Bar Association, 206 Minn. at 295, 288 N.W. at 791.
The consequences of permitting conduit PAC's do not conflict with any of the apparent intentions of the legislature when it enacted the statute. A conduit PAC merely aids the political process by stimulating and facilitating the involvement of a larger number of citizens. So long as the sponsoring entity exerts no influence on the member to contribute to a particular candidate, group of candidates, or type of candidate, the member is merely exercising his personal right to contribute to candidates of his choice. There may well be circumstances under which some subtle pressures are placed on conduit PAC members to support specific candidates, but this could be guarded against by protecting the anonymity of the individual contributor's choice.
For the same basic reasons, except for the further lack of the statutorily required "thing of value," independent PAC's are not violative of the legislative intent.
In contrast to the conduit PAC, the partisan PAC is a new incarnation of the precise evil to which the original statute was directed. If a corporation can select a slate of candidates, solicit the contributions of its employees, then make large contributions to particular campaigns through a PAC, it can exert the same disproportionate influence that it could have with a donation directly from its treasury.[5] We therefore hold that it was the clear legislative intent to prohibit partisan PAC's, but not to prohibit either "conduit" or "independent" PAC's as described above.[6]
*530 2. There is no significant difference between the language of Minn.Stat. § 72A.12, subd. 5 (1980) and Minn.Stat. § 210A.34 (1980), either linguistically or historically; therefore the same arguments and conclusions already made concerning the latter apply to the former.
3. Subdivision 1 of Minn.Stat. § 210A.34 (1980) refers to "any corporation doing business in this state" and raises the question of its applicability to nonprofit corporations. Tracing the legislative history and the construction of the Wisconsin statute upon which § 210A.34's predecessor was based reveals an intent not to apply corrupt practice acts to nonprofit corporations. A question is raised because the dicta in the LaBelle opinion suggests that the then-current version of the statute applied to nonprofit corporations.
Both the June 4, 1912, Minneapolis Journal and the June 13, 1912, St. Paul Pioneer Press reported that the corrupt practices law was modeled after the Wisconsin law. See Act of June 21, 1905, ch. 492, § 1, 1905 Wis.Laws 869, current version at Wis.Stat. Ann. § 12.56(1) (West 1967). Examination of the two statutes shows the pertinent language to be virtually identical. In State v. Joe Must Go Club of Wisconsin, 270 Wis. 108, 70 N.W.2d 681 (1955), the Wisconsin Court construed their statute as inapplicable to nonprofit corporations. The court reasoned that language used by the governor of Wisconsin at the time,[7] which inspired enactment of their statute, evidenced the interest of the legislature. Id. at 114, 70 N.W.2d at 684. Minnesota legislators' outrage at the actions of the powerful brewing interests, discussed under the first issue, echoes the sentiments of the governor of Wisconsin and evinces a similar intent. We therefore hold that the question of this court's comments on nonprofit corporations in LaBelle is dicta, and in no way precedential.[8] We hold, as Wisconsin did, that the statute is inapplicable to nonprofit corporations.
PETERSON and KELLEY, JJ. took no part in the consideration or decision of this case.
YETKA, Justice (dissenting in part and concurring in part).
The majority opinion is contrary to the plain meaning of the statute. Minn.Stat. § 210A.34, subd. 1 (1980) clearly states:
It shall be unlawful for any corporation doing business in this state to make any contribution or to offer, consent or agree to make any contribution, directly or indirectly, of any money, property, free service of its officers or employees or thing of value to any political party, organization, committee or individual to promote or defeat the candidacy of any person for nomination, election, or appointment to any political office. For the purpose of this subdivision, "contribution" includes an expenditure to promote or defeat the election or nomination of any candidate to any political office which is made with the authorization or expressed or implied *531 consent of, or in cooperation or in concert with, or at the request or suggestion of a candidate, his principal campaign committee or his agent.
(Emphasis added.) Minn.Stat. § 72A.12, subd. 5 (1980) concerning political contributions from insurance companies and associations contains similar language.
In short, a straightforward reading of the statutes indicates an unambiguous legislative intent to prohibit corporate activity of this sort in the political process of the state.[1] I would hold that the statute bars not only partisan PAC's, but non-partisan PAC's and independent PAC's as well. Even the wholly independent corporate PAC lends at least its name, and whatever prestige accompanies the corporate name, to any candidates receiving contributions from the PAC. Moreover, the independent PAC is not immune from the subtle influence involved where an employee's boss urges the employee to contribute, oversees that the contribution is made, and even suggests how it might be used. We have in Minnesota a clear mandate prohibiting such activity. These statutes, combined with our income tax return checkoff system, provide a duress-free environment in which employees can freely choose to contribute to the political process.
I would admit some doubt remains as to non-profit corporations. If those non-profit corporations are set up in the form of a foundation to collect money for political use, it would appear that they are not barred by the statute because they are not engaged in business. That is as far as I would go, however. I believe the majority opinion writes into the statute that which the statute specifically proscribes.
WAHL, Justice (dissenting in part and concurring in part).
I join in the dissent and concurrence of Justice Yetka.
NOTES
[1] A commentator suggests that the Federal Election Campaign Act of 1971 (FECA), Pub.L. No.92-225, 86 Stat. 3 (1972) (current version at 2 U.S.C. §§ 431-455 (1976 & Supp. IV 1980)) is the "root cause" of the PAC phenomenon. In an article which was part of an Arizona Law Review Symposium on PAC's, Professor Edwin Epstein points out that the FECA allowed corporations and unions to communicate with their employees and members, respectively, on any subject, and allowed them to use corporate and union money "to establish and administer a `separate segregated fund' to be used for political purposes  that is to set up political action committees." Epstein, The PAC Phenomenon: An Overview, 22 Ariz.L.Rev. 355, 358 (1980).
[2] The Minnesota statute was one of a number of state statutes enacted following a wave of national election financing reform. See United States v. International Union United Automobile Workers, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) (national reform movement described at length).
[3] Minn.Stat. § 645.16 (1980) provides that:

When the words of a law are not explicit, the intention of the legislature may be ascertained by considering, among other matters:
(1) The occasion and necessity for the law;
(2) The circumstances under which it was enacted;
(3) The mischief to be remedied;
(4) The object to be attained;
(5) The former law, if any, including other laws upon the same or similar subjects;
(6) The consequences of a particular interpretation;
(7) The contemporaneous legislative history; and
(8) Legislative and administrative interpretations of the statute.
[4] The State Ethics Commission, currently the State Ethical Practices Board, see Minn.Stat. § 10A.02, subd. 1 (1980), has authority to issue and publish advisory opinions, but the effectiveness of those opinions lapses after approximately two years. Id., subd. 12. The other parties therefore correctly downplay the significance of this opinion because it has no current legal effect. The absence of binding legal effect does not, however, detract from the soundness of the opinion's reasoning, which we find persuasive.
[5] Cf. Wertheimer, The PAC Phenomenon in American Politics, 22 Ariz.L.Rev. 603, 607 (1980) ("Growth in both the number of PAC's and the volume of PAC money has resulted in an increasingly heavy reliance by candidates on special interest group donors.").
[6] See First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), wherein the court found it unconstitutional to prohibit a corporation from contributing money or making expenditures to promote or defeat the passage of a ballot question, by stating in part:

The overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. The importance of the governmental interest in preventing this occurrence has never been doubted. The case before us presents no comparable problem, and our consideration of a corporation's right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office. Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections.
Id. at 788 n.26, 98 S.Ct. at 1422 n.26. (citations omitted).
[7] "Corporations are organized for profit and gain, and enter the field of politics solely in the interests of the business for which they are created." Journal of the Senate of the Wisconsin Legislature, Vol. 1, at 89 (1905), quoted in State v. Joe Must Go Club of Wisconsin, 270 Wis. at 111, 70 N.W.2d at 682.
[8] Justice Stone agreed with that characterization in his brief concurrence, 206 Minn. at 300, 288 N.W. at 793 (Stone, J., concurring). Since the LaBelle decision, Minn.Stat. § 317.05 (1980) was enacted, Minnesota Nonprofit Corporation Act, ch. 550, § 5, 1951 Minn.Laws 843, which authorizes the formation of nonprofit corporations for "political" purposes.
[1] Minn.Stat. § 210A.34, subds. 5-7 (1980) expressly exempt specific forms of corporate activity from the prohibition of subdivision 1. These exceptions are for corporate conduct of an informational nature rather than a financial nature, however.